**STATE of Missouri, Respondent,**

v.

**Billy Jack HATFIELD, Appellant.**

**No. WD 72468.**

Missouri Court of Appeals, Western District.

Aug. 30, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2011.

Application for Transfer Denied Dec. 6, 2011.

Emmett D. Queener, Columbia, MO, for appellant.

Shaun J. Mackelprang, Robert J. Bartholomew, Jefferson City, MO, for respondent.

Before: GARY D. WITT, P.J., and JAMES E. WELSH and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Billy Jack Hatfield was convicted in the Cass County Circuit Court of driving while intoxicated ("DWI"), § 577.010, RSMo, and of driving while his driving privilege was revoked, § 302.321, RSMo. He appeals. Although Hatfield does not challenge his conviction for driving while revoked, he argues that the evidence was insufficient to establish beyond a reasonable doubt that he drove his vehicle while intoxicated. We agree, and reverse his DWI conviction.

## Factual Background

Deputy Jacob Shanks of the Cass County Sheriff's Department was dispatched to an accident at 814 Ward Road in Raymore at approximately 11:00 a.m. on September 10, 2008. When he arrived at the scene, Deputy Shanks observed a Chevrolet Camaro parked in the driveway of a home with a damaged front end, rut marks in a ditch next to the vehicle, a damaged fence

near the car, and Hatfield standing outside the vehicle. No one else was present at the scene. Deputy Shanks asked Hatfield what happened, and he responded that "I lost it making the turn." Deputy Shanks observed multiple indicators that Hatfield was intoxicated, including a strong odor of alcohol on his breath, slurred speech, and balance problems. When Deputy Shanks asked Hatfield for his driver's license, Hatfield responded that it was revoked. Deputy Shanks confirmed the revocation and arrested Hatfield for driving while revoked and suspicion of driving while intoxicated.

Deputy Shanks transported Hatfield to the Cass County Sheriff's Office and had the vehicle towed and impounded. After arriving at the station, Hatfield refused to perform the standard field sobriety tests. Deputy Shanks also read Hatfield the Missouri Implied Consent Law which required him to provide a sample of his breath, blood, or urine, or otherwise face a one year driver's license revocation. Hatfield refused to provide the breath sample which Deputy Shanks requested.

Deputy Shanks was the sole witness at trial. The jury found Hatfield guilty of DWI and of driving while revoked. The court had previously found Hatfield to be a prior and persistent offender. It sentenced him to two concurrent sentences of four years' imprisonment. This appeal follows.

## Standard of Review

"Where the appellant challenges the sufficiency of the evidence supporting a conviction, '[a]ppellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror could find the defendant guilty beyond a reasonable doubt.'" *State v. Donahue*, 280 S.W.3d 700, 701 (Mo.App. W.D. 2009) (en banc) (citation omitted). In resolving a sufficiency-of-the-evidence claim, we review the evidence in the light most favorable to the State. *State v. O'Brien*, 857 S.W.2d 212, 215–16 (Mo. banc 1993). "Thus, evidence that supports a finding of guilt is taken as true and all logical inferences that support a finding of guilt and that may reasonably be drawn from the evidence are indulged." *Id.* at 216. "Conversely, the evidence and any inferences to be drawn therefrom that do not support a finding of guilt are ignored." *Id.* In conducting our review, we are mindful that "[t]he appellate court must not act as a 'super juror' exercising veto power, but, rather, must give great deference to the trier of fact." *Donahue*, 280 S.W.3d at 701. While we give substantial deference to the jury's assessment of the evidence presented at trial, we "may not supply missing evidence or give the [State] the benefit of unreasonable, speculative, or forced inferences." *State v. Olten*, 326 S.W.3d 137, 139 (Mo.App. W.D.2010) (citations and internal quotation marks omitted).

## Analysis

In his sole Point Relied On, Hatfield argues that the evidence was insufficient to convict him of driving while intoxicated because the State failed to establish that he was under the influence of alcohol at the time he was operating a motor vehicle.[1] We agree.

As the name of the offense indicates, to support a conviction under § 577.010 the State must prove beyond a reasonable doubt that the defendant was (1) driving (2) while (3) intoxicated. Each of these words has significance, and imposes a sep-

---

1. Hatfield does not challenge his conviction for driving while revoked, or the trial court's

finding that he was a prior and persistent offender.

arate evidentiary burden on the State.[2]

Here, Hatfield does not dispute that the State's evidence was sufficient to establish two of these critical facts: (1) that he drove the vehicle at some time before Deputy Shanks arrived; and (2) that he was intoxicated when the deputy arrested him. He argues, however, that no evidence established that he drove the car *while* he was intoxicated.

The State asserts that there was sufficient circumstantial evidence to infer that Hatfield was impaired while driving. The undisputed testimony of Deputy Shanks established that on September 10, 2008, at approximately 11:00 a.m., he "was dispatched to 814 Ward Road in regard to see a motor vehicle accident." When arriving at the scene Deputy Shanks "observed a silver vehicle in the driveway" and saw Hatfield "standing outside the vehicle and rut marks in the ditch next to the vehicle." Deputy Shanks approached Hatfield, who said that "I lost it making the turn." Hatfield also told Deputy Shanks that his driver's license was revoked. Deputy Shanks testified that he "detected a strong odor of intoxicating beverage" on Hatfield's breath; observed that his speech was "slightly slurred," and his eyes "glassy and watery"; and noticed that "there was a slight sway when [Hatfield] was standing and a little stumbling when he was walking." Deputy Shanks concluded that Hatfield was intoxicated and placed him under arrest.

Hatfield's vehicle was towed from the scene while Deputy Shanks transported Hatfield to the Cass County Sheriff's Office. Although Deputy Shanks could not remember where he found the keys to the vehicle, he testified that he located the keys somewhere "on scene." After arriving at the Sheriff's Office, Hatfield refused to complete the standard field sobriety tests or to provide a breath sample.[3] Deputy Shanks testified that in his opinion Hatfield "was too intoxicated to operate a motor vehicle on September 10, 2008."

As Hatfield concedes, there was sufficient circumstantial and direct evidence to establish that he was operating the motor vehicle when the accident occurred. Here, there was a single set of rut marks leading through the ditch to the driveway where Deputy Shanks located Hatfield next to a parked car. There were no other vehicles or persons present when Deputy Shanks arrived, nor was there any evidence that other vehicles or persons had previously been present on the scene prior to his arrival. Most importantly, Hatfield told Deputy Shanks that "I lost it making the turn." Based on this evidence a rational fact-finder could find that Hatfield was operating the vehicle at the time the accident occurred.

Likewise, there was sufficient evidence from which the jury could conclude that Hatfield was intoxicated when Deputy Shanks arrived at the scene, based on Deputy Shanks' testimony concerning the multiple well-known indicia of intoxication which he personally observed. *See, e.g., State v. England,* 92 S.W.3d 335, 342 (Mo. App. W.D.2002) (holding that "[b]loodshot

2. *See, e.g., State v. Varnell,* 316 S.W.3d 510, 513 (Mo.App. W.D.2010) ("The offense of driving while intoxicated, section 577.010.1, requires proof of two elements: (1) that the defendant operated a motor vehicle, and (2) was intoxicated while doing so." (citations and internal quotation marks omitted)).

3. Deputy Shanks Stated that he did not ask Hatfield to complete the field sobriety tests at the scene because "[i]t's a gravel road. Its not necessarily flat and level. It's gravel. We were going to be going to jail—to because of the driving while revoked anyways. I wanted to give him the benefit of the doubt on the flat surface of tile to perform the test, considering half the tests are part of balance."

and watery eyes, slurred speech, and the smell of alcohol on one's breath are indicia of intoxication"); *State v. Hoy*, 219 S.W.3d 796, 807 (Mo.App. S.D.2007) (stating that "intoxication sufficient to sustain conviction may be proved by lay witness who has had reasonable opportunity to observe alleged offender"). Hatfield's post-arrest behavior at the Sheriff's Office, during which he was verbally combative and used profanity, provides further circumstantial evidence that he was intoxicated at the time.

■ However, Hatfield's mere intoxication near his vehicle, without evidence establishing when he last operated it, is insufficient to support his conviction for driving while intoxicated. Missouri courts have made clear that the State must present evidence *linking in time* the defendant's intoxication to the operation of a motor vehicle. " '[T]ime is an element of importance' that the state must prove to sustain its burden to show that a driver drove while intoxicated." *State v. Wilson*, 273 S.W.3d 80, 82 (Mo.App. W.D.2008). Where intoxication is observed at a time separate from the operation of a motor vehicle, a "factfinder cannot determine that one who is under the influence of an alcoholic beverage at an established time was necessarily in that condition at some earlier unspecified moment without any evidence concerning the length of the interval involved." *State v. Davis*, 217 S.W.3d 358, 361 (Mo.App. W.D.2007) (internal quotation marks and citation omitted); *see also State v. Ollison*, 236 S.W.3d 66, 69 (Mo.App. W.D.2007).

■ While we recognize that "[t]he case law on this issue is very fact-specific," *State v. Byron*, 222 S.W.3d 338, 341 (Mo. App. W.D.2007), a review of prior decisions addressing similar situations reflects that a DWI conviction cannot be sustained where the State fails to present evidence to support the inference that the defendant's intoxication was observed within a reasonable period of time following the defendant's operation of a motor vehicle, and that the defendant did not become intoxicated in the interim. Thus, in *Davis*, a police officer responded to a dispatch report about a car accident only to find no one in or around the vehicle. 217 S.W.3d at 359. A bystander told the officer that the vehicle's occupants had fled to an address two to three blocks away, and the officer "immediately" went there. *Id.* One of the men the officer found at the address admitted to crashing his car into a light pole. *Id.* The officer arrested the driver for driving while intoxicated after he detected "an odor of intoxicating beverage" and noticed that the driver's eyes were "glassy, watery, and bloodshot." *Id.*

*Davis* reversed the defendant's DWI conviction based on the same gap in the evidence that exists here: the lack of evidence establishing a temporal connection between the defendant's admitted operation of a motor vehicle, and his observed intoxication at the time of arrest.

[T]he State's evidence established only that Davis drove the vehicle and that he was intoxicated when he was arrested. The State failed to present any evidence as to when Davis began drinking or how much he had to drink. There is nothing in the record to establish the approximate time that Davis was operating the vehicle or the time [the] accident occurred. None of the evidence indicated how much time elapsed between the accident and the arrest.

*Davis*, 217 S.W.3d at 361.

Indeed, the evidence in *Davis* was *stronger* than the evidence here in one material respect. In *Davis*, the defendant admitted that he had not had anything to drink after the accident. *Id.* The Court emphasized, however, that "intoxication

does not occur immediately upon the consumption of alcoholic beverages. Alcohol must be absorbed into the bloodstream before the intoxicants begin to take effect thirty to ninety minutes later." *Id.* (citing 2 Donald H. Nichols & Flem K. Whited III, *Drinking/Driving Litigation: Criminal and Civil* §§ 14.3, 14.27 (1998)).[4] Because of this delayed effect, the Court held that Davis' admission of no alcohol consumption following the accident did not establish his intoxication at the time: "[i]f Davis had started drinking a few minutes before the accident occurred, he would not have been intoxicated while driving but the intoxicating effects might have been apparent sometime later when he was confronted by [the arresting officer]." *Id.* "Given the absence of evidence to show the approximate time of Davis's accident, the State failed to prove beyond a reasonable doubt that he drove while intoxicated." *Id.*

Similarly, in *Byron*, 222 S.W.3d 338, we reversed a DWI conviction where officers responded to a dispatch involving a vehicle which had been involved in a one-car accident sometime between 12:40 a.m. (when an officer passed the scene and observed nothing unusual) and 1:45 a.m. (when a 911 call was placed concerning the accident). *Id.* at 339. Officers found the vehicle owner at his home at approximately 2:00 a.m., where they noticed indicia of intoxication similar to those observed by Deputy Shanks in this case: "Byron smelled of alcohol, had watery, bloodshot eyes, had slurred speech, and had trouble with his balance." *Id.* at 339–40. Byron falsely

claimed that he knew nothing about an accident involving his vehicle, and claimed that his father had borrowed his car. *Id.* at 340. Byron performed poorly on multiple field sobriety tests; like Hatfield, he refused to take a breathalyzer test. *Id.* Nevertheless, because "[t]here was no evidence that Byron did *not* obtain alcohol [subsequent to the accident] and consume it in the relevant time interval" of as much as one hour and twenty minutes between the accident and his encounter with law enforcement officers, we reversed his DWI conviction. *Id.* at 343–44.

We have reached the same result in other factually similar cases. *See, e.g., Wilson*, 273 S.W.3d at 82 (reversing DWI conviction where "[t]here [was] no testimony as to when the accident occurred," or concerning the time which elapsed between the accident and the testing of defendant's blood for alcohol content); *Ollison*, 236 S.W.3d at 69 ("Given the absence of evidence to establish the interval between Olson's operation of the vehicle and his arrest[, when he was observed to be intoxicated], the State failed to prove beyond a reasonable doubt that he drove while intoxicated."); *State v. Liebhart*, 707 S.W.2d 427, 429 (Mo.App. W.D.1986) (reversing DWI conviction where "[t]here is no evidence whatsoever as to the time of the accident or the interval between its occurrence and the officer's arrival on the scene. Moreover, the evidence fails to indicate whether appellant had access to intoxicating beverages at the accident site prior to the officer's arrival.").[5]

---

**4.** *State v. Varnell*, 316 S.W.3d 510 (Mo.App. W.D.2010), observed that "[t]he same source [cited in *Davis* ] notes that while maximum absorption on average does not occur until the thirty-to ninety-minute window, absorption begins soon after the alcohol is consumed." *Id.* at 517–18.

**5.** *Superseded by statute on other grounds, Cox v. Dir. of Revenue*, 98 S.W.3d 548, 551 (Mo. banc 2003).

*State v. Varnell*, 316 S.W.3d 510 (Mo.App. W.D.2010), which upheld a DWI conviction against a defendant's contention that "the record is insufficient to create the timeline essential to a showing that his intoxication

■ Thus, to sustain a DWI conviction the State must establish, through direct or circumstantial evidence, the temporal connection between the defendant's last operation of a motor vehicle and his observed intoxication. Such evidence is lacking here. The State's evidence in this case established only that Hatfield drove the vehicle in question at the time of the accident and that he was intoxicated when Deputy Shanks arrived. Here, there is no evidence as to "the approximate time" that Hatfield was "operating the vehicle or the time [the] accident occurred," or "how much time elapsed between the accident and the arrest." *See Davis*, 217 S.W.3d at 361.

Deputy Shanks performed only minimal investigation at the scene of the accident, other than placing Hatfield under arrest.[6] Deputy Shanks did not ask Hatfield whether he had driven the vehicle that day or when the accident occurred. He also could not remember if the automobile was running when he arrived at the scene, and could not testify definitively that the vehicle had been driven on that particular day. Further, Deputy Shanks admitted that he did not know when the fence damage and ruts in the ditch were caused, and acknowledged that the ruts could have ex-

isted for six months or even one year. Deputy Shanks did not check the hood or passenger compartment of the vehicle to see if it their temperature indicated recent use of the vehicle. He was also unable to recall where he located the keys to the vehicle, even though he considered that an "important" fact. Moreover, Deputy Shanks also failed to canvass the scene in an effort to locate any witnesses to the accident. The identity of the individual who provided the information leading to Deputy Shanks' dispatch to the scene is unknown, and the record does not reflect any information concerning the circumstances of the accident which the informant may have provided. In sum, it is impossible to determine from the record the approximate time Hatfield last operated the vehicle, and therefore the State failed to temporally connect Hatfield's intoxication when Deputy Shanks arrived at the scene to his previous operation of the vehicle.

Furthermore, the State did not introduce any evidence establishing whether Hatfield had access to alcohol at or near the scene of the accident. *See State v. Royal*, 277 S.W.3d 837, 840 (Mo.App. W.D. 2009) ("When significant time lapses between the accident and the observation of

---

was contemporaneous with operating the vehicle," *id.* at 514, is not to the contrary. In *Varnell*, an investigating officer testified that there were no alcohol containers found in or near defendant's vehicle, and the evidence indicated that the defendant "did not have access to alcohol and could not have become intoxicated *after* he wrecked his vehicle," *id.* at 515; the defendant "admitted to the deputy that he had been drinking prior to the accident," *id.* at 516; evidence was presented concerning the particular circumstances of the single-vehicle accident, *id.*; the evidence "support[ed] the conclusion, beyond a reasonable doubt, that the interval of time between the defendant's accident and arrest was relatively brief," *id.*; and defendant's blood-alcohol concentration following the accident was

more than three times the legal limit. *Id.* at 517. None of these circumstances exist here.

**6.** According to the State, Deputy Shanks did not conduct the standard field sobriety tests at the scene or conduct further investigation of the accident because Hatfield was well known to the Cass County Sheriff's Department as being combative with officers. (The circuit court heard testimony concerning Hatfield's alleged reputation for combativeness outside the presence of the jury, but did not allow its admission at trial.) Even if Deputy Shanks' failure to conduct further investigation at the scene was understandable, however, this did not relieve the State of its burden of proving each element of the charged offense beyond a reasonable doubt.

the defendant's intoxication, the State must prove the defendant did not have access to alcohol during the interim"); *Byron*, 222 S.W.3d at 343. Deputy Shanks did not testify whether he observed any alcoholic beverage containers in the automobile or whether he completed an inventory of the vehicle at the scene. Nor did the State introduce any evidence of an inventory after the vehicle was towed and impounded. Deputy Shanks also failed to contact the owner of the home where Hatfield was found, or describe whether the area was a residential neighborhood where Hatfield could have been present for an extended period and had ready access to alcohol, or instead an isolated driveway where lingering was unlikely, and alcohol likely unavailable. For these reasons, the State's proof fails to refute the possibility that Hatfield became intoxicated during the period between the accident and Deputy Shanks' arrival.

■ The State argues that Hatfield's later refusal to perform field sobriety tests, or submit to a chemical breath test, establishes his consciousness of guilt for driving while intoxicated, and can support the jury's verdict despite the evidentiary gaps discussed above. We rejected a similar argument in *Byron*, however, reasoning that refusal of a breathalyzer test, and a defendant's false denials that he had been driving, "could not be regarded as highly probative of the fact that [the defendant] was intoxicated when he was driving," given the lapse of time between the defendant's driving and his refusal,

and the defendant's apparent access to alcohol in the interim. 222 S.W.3d at 342; *see* also *id.* at 343 ("The forty-minute-or-more interval between the accident and the contact with officers, together with the fact that Byron had access to alcohol, is difficult for the State to overcome, even balanced against the fact that Byron's conduct, after contacted by police, was consistent with someone who had been driving while intoxicated (falsely denying that he had been driving and refusing the test)."). Here, the time which elapsed between Hatfield's operation of the vehicle and his refusal to submit to field sobriety and chemical breath tests is unknown, and the State failed to negate the possibility that he had access to alcohol in the meantime (including any alcohol which may have been in his car). Under *Byron*, Hatfield's refusal to submit to field sobriety or breathalyzer tests cannot establish, beyond a reasonable doubt, that he was driving while intoxicated.[7]

■ The State also argues that the circumstances of the accident establish Hatfield's guilt of DWI. But "the manner of a crash does not, on its own, provide sufficient evidence to support a conviction" of DWI. *Varnell*, 316 S.W.3d at 516. We note that *Byron, Davis, Ollison, Wilson,* and *Liebhart* each involved single-car accidents, yet in each case the appellate court reversed a DWI conviction, due to precisely the same evidentiary defect existing in this case: lack of evidence temporally connecting defendant's condition at the time of the accident to his observed intoxication

---

**7.** *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), is not to the contrary. *Neville* recognized that the California Supreme Court had reasoned that "evidence of refusal to take a potentially incriminating test is similar to other circumstantial evidence of consciousness of guilt, such as escape from custody and suppression of evidence." *Id.* at 561, 103 S.Ct. 916. The Unit-

ed States Supreme Court expressly "decline[d] to rest [its] decision on this ground," however. *Id.* We also note that *Neville* involved an entirely separate question from the one presented here: whether admission of evidence of a defendant's refusal to take a blood-alcohol test violated his Fifth Amendment right against compelled self-incrimination.

when later arrested.[8] We also note that very little evidence concerning the circumstances of Hatfield's accident was presented to the jury. While Hatfield admitted that he "lost it making the turn," and Deputy Shanks testified that the weather was clear, and the traffic and road conditions normal, at the time he encountered Hatfield, the lighting, weather, and road conditions at the time of the accident are unknowable, given the lack of evidence as to when the accident occurred. There is no evidence, either through testimony or through other evidence (such as photographs), as to the nature of the turn where the accident occurred, the speed limit, signage, presence or absence of skid marks, etc. The record also does not reveal the extent of the vehicle or fence damage, or the length or depth of the ruts in the ditch, which the jury could reasonably have found Hatfield caused.

Although we grant the State all reasonable inferences from the evidence, *State v. Grim,* 854 S.W.2d 403, 411 (Mo. banc 1993), here there is no evidence to support any particular inference regarding an essential element of the State's case: whether Hatfield was intoxicated *while* driving. Given the absence of evidence to show the approximate time of Hatfield's accident, when he last consumed alcohol, or whether any alcohol was available at or near the scene, we cannot say that the evidence was sufficient to permit a reasonable juror to find Hatfield guilty of driving while intoxicated beyond a reasonable doubt. As we have previously observed, "[i]t is the obligation of the State to prove a criminal case

beyond a reasonable doubt. It is not the function of the court to ignore its failure." *Wilson,* 273 S.W.3d at 82.

## Conclusion

We reverse the circuit court's judgment to the extent that it convicted and sentenced Hatfield for driving while intoxicated, § 577.010, RSMo. Our disposition does not affect Hatfield's conviction or sentence for driving while his driving privilege was revoked, § 302.321, RSMo.

All concur.

---

**8.** While *Varnell* relied, in part, on the circumstances of a single-car accident in finding sufficient evidence to support a DWI conviction, in that case a law enforcement officer examined the accident scene in detail, and concluded that the defendant had "committed a lane violation and crashed into a culvert [on the opposite side of the road,] causing the

vehicle to nose into the ground and roll multiple times," "on a dry road with daylight still remaining." 316 S.W.3d at 513, 516. Besides the fact that Hatfield's accident was far less severe than that in *Varnell,* here there was no similar testimony or evidence concerning the surrounding circumstances.