

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | WD76971 |
| Respondent, | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| STEVEN WILLIAM SHOEMAKER, | ) | November 18, 2014 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Jack Richard Grate, Judge**

**Before Division Three:  Gary D. Witt, P.J.,**
**Joseph M. Ellis, and Thomas H. Newton, JJ.**

## Summary

Mr. Steven William Shoemaker appeals the convictions of driving a motor vehicle with an excessive blood-alcohol content (BAC), § 577.012,[1] and driving while revoked (DWR), § 302.321.  We affirm in part and reverse in part.

## Factual and Procedural Background

In October 2009, at about 8 p.m., Detective Todd Hargis of the Independence Police Department stopped Mr. Shoemaker on Interstate 70 for driving at an excessive speed. Upon approaching Mr. Shoemaker's vehicle, Detective Hargis smelled "the odor of an intoxicating beverage." The detective requested

---

[1] Statutory references are to RSMo 2000 and the Cumulative Supplement 2009, unless otherwise stated.

identification; Mr. Shoemaker provided an insurance card and a business card. Thereafter, the detective learned through police dispatch that Mr. Shoemaker's license had been suspended, and that he had outstanding warrants. The detective requested a second unit to the location for assistance.[2]

When the second unit arrived, Detective Hargis arrested Mr. Shoemaker for the warrants. He also advised the assisting officer that he "smelled the odor of alcohol" in Mr. Shoemaker's vehicle, and that he "wanted him put in a secure area so he couldn't have oral intake until [he] could . . . make contact with him." The assisting officer transported Mr. Shoemaker to the Independence Police Department.

Detective Hargis made contact with Mr. Shoemaker in detention. He smelled alcohol on Mr. Shoemaker's breath and asked him to perform the standard field sobriety tests. After the detective explained the tests, Mr. Shoemaker stated that he had "bad knees" and wanted to speak to an attorney. Detective Hargis allowed him twenty minutes to contact an attorney. Afterward, Mr. Shoemaker refused to submit to the field sobriety tests. However, he did submit to a breathalyzer test at 9:13 p.m. – seventy-three minutes after the arrest – and after the detective read him the

---

[2] At the time of the stop, Detective Hargis was conducting traffic enforcement on the westbound entrance ramp of Little Blue Parkway and I-70. He used a radar device to determine the speeds of passing motorists.

Missouri Implied Consent Law.[3]   The breath sample resulted in a reading of .084.

Detective Hargis completed an Alcohol Influence Report, which included advising Mr. Shoemaker of *Miranda*[4] rights.   Mr. Shoemaker agreed to answer questions and admitted to driving the vehicle, but not to consuming alcohol.

Mr. Shoemaker was charged by information with the Class D felony of driving a motor vehicle with an excessive BAC as a persistent offender, § 577.012, which was later amended[5] to a Class B misdemeanor.  He was also charged with the Class A misdemeanor of DWR, § 302.321.

After a bench trial, Mr. Shoemaker was convicted of both charges. The trial court sentenced him to 30 days of imprisonment for driving a motor vehicle with an excessive BAC, and assessed a fine of $300.  The trial court assessed an additional fine of $300 for DWR.  Mr. Shoemaker appeals.

---

[3] The Implied Consent Law, § 577.020, states, in relevant part:

> 1. Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent to, subject to the provisions of sections 577.019 to 577.041, a chemical test or tests of the person's breath, blood, saliva or urine for the purpose of determining the alcohol or drug content of the person's blood pursuant to the following circumstances:
>
> (1) If the person is arrested for any offense arising out of acts which the arresting officer had reasonable grounds to believe were committed while the person was driving a motor vehicle while in an intoxicated or drugged condition.

[4]*Miranda v. Arizona*, 384 U.S. 436 (U.S. 1966).

[5] At trial, the State presented Exhibits Five and Six as evidence that Mr. Shoemaker should be found guilty as a persistent offender. The exhibits consisted of certified copies of Mr. Shoemaker's driving record, which included a previous SIS conviction and a term of probation for Driving While Intoxicated. The exhibits were missing indicia of whether Mr. Shoemaker had pled guilty or not guilty. Therefore, the trial court deemed the documents "facially deficient" for purposes of serving as the sole evidence to enhance Mr. Shoemaker's conviction, and neither document was admitted into evidence.

## Standard of Review

Our "review is to determine whether substantial evidence was adduced to support the trial court's finding." *State v. Collins*, 413 S.W.3d 689, 696 (Mo. App. S.D. 2013) (internal quotation marks and citation omitted). When making a determination of the sufficiency of evidence to support the conviction, we accept "as true all evidence tending to prove guilt together with all reasonable inferences that support the finding." *Id.* at 696-97. We ignore "[a]ll contrary evidence and inferences." *Id.* at 697 (internal quotation marks and citation omitted).

"When we are faced with a record of facts that supports conflicting inferences, we must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *State v. Bryan*, 439 S.W.3d 781, 784 (Mo. App. S.D. 2014). "Circumstantial evidence is given the same weight as direct evidence in considering the sufficiency of evidence." *Id.*

## Legal Analysis

Mr. Shoemaker raises three points. In the first point, he argues that the trial court erred in denying the motions for judgment of acquittal at both the close of the State's evidence and the close of all evidence because the State "failed to sustain its burden of proof that [he] was physically operating or driving a motor vehicle" while possessing "an excessive blood alcohol content." He claims that "there was no evidence" of his "blood alcohol concentration" *at the time* that he physically operated or drove a motor vehicle.

4

Section 577.012 states:

> 1. A person commits the crime of "driving with excessive blood alcohol content" if such person operates a motor vehicle in this state with eight-hundredths of one percent or more by weight of alcohol in such person's blood.

> 2. As used in this section, percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred milliliters of blood or two hundred ten liters of breath and may be shown by chemical analysis of the person's blood, breath, saliva or urine. For the purposes of determining the alcoholic content of a person's blood under this section, the test shall be conducted in accordance with the provisions of sections 577.020 to 577.041.
> 3. For the first offense, driving with excessive blood alcohol content is a class B misdemeanor.

Pursuant to section 577.012, "proof of a numerical measure of blood alcohol content" is "essential" to prove the offense of driving with an excessive BAC. *State v. Martin*, 103 S.W.3d 255, 263 (Mo. App. W.D. 2003). However, such proof "is not essential in a DWI case." *Id.* Instead, "to sustain a DWI conviction[,] the State must establish, through direct or circumstantial evidence, the ***temporal connection*** between the defendant's last operation of a motor vehicle and his observed intoxication." *State v. Hatfield*, 351 S.W.3d 774, 780 (Mo. App. W.D. 2011) (emphasis added). Mr. Shoemaker cites to *Hatfield*, among other cases, in support of his argument that the State failed to prove that he had an excessive BAC ***at the time*** he was driving.

In *Hatfield*, an officer was dispatched to a scene where an impaired driver was already separated from a parked vehicle upon the officer's arrival, and no evidence existed to establish when the driver last operated the vehicle. *Id.* at 777. The *Hatfield* court found that, "[w]here intoxication is observed at a time separate from the operation of a motor vehicle, a 'factfinder cannot determine that one who is under the influence of an alcoholic beverage at an established time was necessarily in that

5

condition at some earlier unspecified moment without any evidence concerning the length of the interval involved.'" *Id.* (internal quotation marks and citation omitted).

The Southern District recently addressed a very similar claim in *Bryan*. In *Bryan*, the defendant challenged the sufficiency of the evidence supporting his conviction of driving while intoxicated.[6]  439 S.W.3d at 782.   The defendant argued that, "while he may have been shown to be intoxicated at some unknown time at least an hour after a trooper was called to the accident scene, there were no signs of intoxication at the accident scene and no evidence that Appellant had no access to methamphetamine between the accident and his observed intoxication."  *Id.*   The Southern District summarized the evidence:

> [The defendant] collided with . . . one of the victim's cars . . . . The collision pushed the . . . car . . . into the oncoming . . . lane [], where it struck another vehicle and killed the second victim . . . . [A Sheriff and a Corporal] . . . met with [the defendant] approximately 40 [to] 45 minutes after the accident.  At that time[,] they observed behavior consistent with methamphetamine intoxication.

*Id.* at 783.  Though the defendant did not challenge evidence supporting impairment at the time of the interview, he argued that there was "no evidence" demonstrating impairment at the time of the accident.  *Id.*  The defendant argued "that the proof of methamphetamine intoxication was too remote from the time of the accident to provide sufficient evidence of intoxication at the time of the accident."  *Id.*  He claimed that it was pure speculation and conjecture that [he] was impaired at the time of the accident because he could have ingested methamphetamine in the hour that may have transpired between the time of the accident and the time of the observations

---

[6] The intoxicating substance was methamphetamine, however, rather than alcohol.

6

by the Sheriff and Corporal, and the State did not provide any evidence that [the defendant] did not have access to methamphetamine in that time period.

*Id*. The Southern District rejected the defendant's claim, finding there to be a reasonable inference[7] "that the methamphetamine was already in his system at the time of the accident." *Id*. at 784. And, after having noted *Chaney*'s requirement that the court accept only those inferences supporting the verdict and reject those that are contrary, the Southern District affirmed the conviction. *Id*.

Similarly, in *State v. Scholl*, 114 S.W.3d 304 (Mo. App. E.D. 2003), the defendant argued that the evidence was insufficient to support the driving element of DWI. *Id*. at 307. The evidence demonstrated that "[the defendant] was seen driving away from the party in his truck alone and, less than thirty minutes later, was found a short distance down the road alone in the front seat of the truck, which had struck a tree and deployed the driver-side airbag." *Id*. The defendant argued that there was a reasonable inference from the evidence that, "in that short time between leaving the party and being found, he switched drivers with some unknown person along the road, who, after crashing [the defendant's] truck into a tree, positioned [the defendant] to appear to have been the driver and fled before anyone arrived." *Id*.

---

[7] The Missouri Supreme Court has firmly rejected application of any rule "that [places] the prosecution . . . under an affirmative duty to disprove every reasonable hypothesis except that of guilt." *State v. Chaney*, 967 S.W.2d 47, 54 (Mo. banc 1998). Missouri courts employed such a rule, known as the "equally valid inferences rule." *Id*. "The equally valid inferences rule was unique to Missouri and state[d] that, '[w]here two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt.'" *Id*. (quoting *State v. Roberts*, 709 S.W.2d 857, 862 (Mo. banc 1986)). But "[t]he equally valid inferences rule was effectively abolished by *State v. Grim*," 854 S.W.2d 403 (Mo. banc 1993). *Id*. "The Court in *Grim* noted that the equally valid inferences rule conflicts with and renders meaningless the requirement that the appellate court presume that the trier of fact drew all reasonable inferences in favor of the verdict." *Id*. (citing *Grim*, 854 S.W.2d at 413–14). "Because the equally valid inferences rule is at war with the due process standard governing an appellate court's review of the sufficiency of evidence, the equally valid inferences rule should no longer be applied." *Id*. "Rather, the standard to be applied is the due process standard set forth in *State v. Grim* and *Jackson v. Virginia*," 443 U.S. 307, 326 (U.S. 1979). *Id*.

The Eastern District rejected the defendant's argument, stating: "While this inference is not factually impossible, we cannot say that it is unreasonable to instead infer that [the defendant] was driving up to and at the time of the accident." *Id.*

Here, in contrast to *Hatfield*, Mr. Shoemaker was stopped **while** driving, placing him in the position of actively operating the vehicle. Detective Hargis testified that he smelled "an intoxicating beverage" when he approached Mr. Shoemaker's vehicle after stopping him for driving at an excessive speed. The detective later completed a lawful breathalyzer test with a well-functioning device that he was certified and trained to use, which resulted in a reading that demonstrated that Mr. Shoemaker's BAC was higher than the legal limit. It has long been recognized by this court that, after it is ingested, alcohol must be absorbed into the blood stream. *Hatfield,* 351 S.W.3d at 778-79; *see also State v. Davis*, 217 S.W.3d 358, 361 (Mo App. W.D. 2007). This process takes thirty to ninety minutes. *Hatfield*, 351 S.W.3d at 779 (citing 2 Donald H. Nichols & Flem K. Whited III, *Drinking/Driving Litigation: Criminal and Civil* §§ 14.3, 14.27 (1998)). Mr. Shoemaker had nothing to drink or smoke between the time of the stop and the breathalyzer test that was administered seventy-three minutes later, which resulted in the BAC reading slightly above the legal limit.

There are at least two possible and reasonable inferences from the evidence: (1) Mr. Shoemaker drank a sufficient quantity of alcohol close enough in time to his arrest that it was still being absorbed at the time his BAC was assessed, implying that his BAC was *under* .080 at the time he drove; or (2) Mr. Shoemaker consumed a sufficient quantity of alcohol long enough before his arrest that the alcohol was in the

8

process of being eliminated from his bloodstream, implying that his BAC was *over* .080 at the time he drove.

As noted *supra*, "[a]n appellate court 'faced with a record of historical facts [supporting] conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *State v. Chaney*, 967 S.W.2d 47, 53-54 (Mo. banc 1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). Therefore, we must presume that the trial court found that Mr. Shoemaker consumed a sufficient quantity of alcohol long enough before his arrest that the alcohol was in the process of being eliminated from his bloodstream, implying that his BAC was over .080 at the time he drove. Accordingly, applying as we must, the requisite deference to the trial court's judgment, point one is denied.

In the second point, Mr. Shoemaker argues that the trial court erred in denying the motions for judgment of acquittal because the State "failed to sustain its burden of proof" that he was operating or driving a motor vehicle with a revoked license. He claims that "there was no evidence" that his license had been revoked, nor was there "any evidence" that he "knew or acted with criminal negligence in not knowing that his license was revoked." Mr. Shoemaker further argues that, because he provided an insurance card to the detective, "[o]ne might rightfully question how one whose license is purported [sic] under sanction may qualify for vehicular liability coverage." He claims that the State "failed to prove through competent ***admissible*** evidence the actual status of [his] Missouri driving privilege." (Emphasis added.)

9

Section 302.321 states, in relevant part:

1. A person commits the crime of driving while revoked if such person operates a motor vehicle on a highway when such person's license or driving privilege has been cancelled, suspended, or revoked under the laws of this state or any other state and acts with criminal negligence with respect to *knowledge* of the fact that such person's driving privilege has been cancelled, suspended, or revoked.

2. Any person convicted of driving while revoked is guilty of a misdemeanor. A first violation of this section shall be punishable by a fine not to exceed three hundred dollars. A second or third violation of this section shall be punishable by imprisonment in the county jail for a term not to exceed one year and/or a fine not to exceed one thousand dollars.

(Emphasis added). To convict Mr. Shoemaker of driving while revoked, "the State must prove beyond a reasonable doubt that [his] license had been revoked, [he] acted with criminal negligence with respect to knowledge of the fact that [his] driving privilege had been revoked, and [he] was operating a motor vehicle on the highways of the State while [his] license was revoked." *State v. Thenhaus*, 117 S.W.3d 702, 703 (Mo. App. E.D. 2003). Thus, "the State [was required to] prove [that Mr. Shoemaker] drove his car while either knowing *or* failing to be aware that his driving privilege was revoked and such failure to be aware constituted a gross deviation from the standard of care a reasonable person would exercise in the situation." *See Collins*, 413 S.W.3d at 700 (citing section 562.016.5).

"Section 562.016.5 provides [that] a person 'acts with criminal negligence' or is criminally negligent when 'he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.'" *Collins*, 413 S.W.3d at 697. A "defendant's mental state may be

10

determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *Id.* (internal quotation marks and citations omitted). Proof of criminal negligence as it pertains to a defendant's knowledge that his driver's license was revoked may be based upon a review of his or her driving record. *Id.*

In this case, the State failed to adduce any evidence that Mr. Shoemaker was aware of the revocation of his license at the time of the stop. For reasons previously stated, Mr. Shoemaker's driving record was not admitted into evidence.[8] However, the State contends that it may reasonably be inferred that Mr. Shoemaker was aware that his license had been revoked because he did not produce it to Detective Hargis when requested. Such an inference simply cannot stand on its own, absent additional evidentiary support. *See*, *e.g.*, *State v. Berrey*, 803 S.W.2d 37, 40 (Mo. App. W.D. 1990) (defendant's DWR conviction was affirmed, based on defendant's failure to produce his license when stopped ***and*** a "portion of the defendant's driving record [that] was read into evidence"). The sole evidence that Mr. Shoemaker's license was, in fact, revoked was the hearsay statement of the dispatcher. Even assuming this evidence was properly admitted over Mr. Shoemaker's objection, there was absolutely no evidence that Mr. Shoemaker had ever been notified of the suspension of his license or that he had any knowledge whatsoever that it was in fact suspended. Thus, the State has failed to meet its burden. Accordingly, point two is granted.

In the third point, Mr. Shoemaker argues that the trial court erred in overruling his objection to information provided to Detective Hargis from a police department dispatcher about his driver's license status and the detective's associated testimony

_____

[8] *See supra* note 5.

11

because the dispatcher's information "consisted of a hearsay statement upon a hearsay statement" upon which the trial court "erroneously and prejudicially" relied as "purported evidence of [his] driver's license status at the time of the stop." He claims that "such reliance was outcome-determinative."

Hearsay statements are "out-of court statements used to prove the truth of the matter asserted" and are generally inadmissible. *State v. Douglas*, 131 S.W.3d 818, 823 (Mo. App. W.D. 2004). However, such statements may be admissible of they fall "within a recognized exception to the rule." *Id.* "Such exceptions are justified because their circumstances sufficiently guarantee the trustworthiness of the out-of-court statement[,] even though not subject to cross-examination." *Id.* Most pointedly, an "officer may rely on information from police dispatch . . . and such third-party statements are in general admissible to establish probable cause, even though they are hearsay." *Tweedy v. Dir. of Revenue*, 412 S.W.3d 389, 395 (Mo. App. E.D. 2013). Furthermore, "an arresting officer . . . can develop probable cause by considering all the information known to the officer, including hearsay statements." *Neer v. Dep't of Revenue*, 204 S.W.3d 315, 322 (Mo. App. W.D. 2006). However, "[i]f an out-of-court statement is not offered to prove the truth of the matter asserted[,] but instead is offered to prove relevant background, then the statement is not inadmissible hearsay." *State v. Dunn*, 101 S.W.3d 922, 925 (Mo. App. S.D. 2003). Additionally, "[s]tatements made by an out-of-court declarant that explain subsequent conduct are admissible as supplying relevant background and continuity." *Id.*

12

Here, Detective Hargis testified that he was informed by police dispatch that Mr. Shoemaker's license had been revoked and that he had existing warrants. This information, coupled with the odor of alcohol emanating from Mr. Shoemaker's vehicle and Mr. Shoemaker's refusal to produce a valid driver's license, supported the officer's finding of probable cause to detain Mr. Shoemaker for further investigation. The subsequent statements from police dispatch were thus not "outcome determinative"; rather, these statements provided relevant background to support suspicions that were already in existence. Thus, the trial court did not err in overruling Mr. Shoemaker's objection. Point three is denied.

## Conclusion

For the above reasons, we affirm the conviction of driving a motor vehicle with an excessive BAC and reverse the conviction of DWR.

/s/ THOMAS H. NEWTON___
Thomas H. Newton, Judge

Witt, P.J., and Ellis, J. concur.