

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102420 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Michael D. Burton |
| GEORGE F. PUTNEY, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 27, 2015 |

## Introduction

Appellant George Putney ("Putney") appeals from the judgment of the trial court entered following a bench trial. The trial court found Putney guilty on two counts: leaving the scene of a motor vehicle accident (Count I) and first-degree involuntary manslaughter (Count II). Putney argues that the trial court erred in denying his motion for judgment of acquittal. Putney contends there was insufficient evidence to find, beyond a reasonable doubt, that he was driving while in an intoxicated condition at the time of the accident. Accordingly, Putney argues that his conviction under Count II should be overturned. Because the evidence and reasonable inferences therefrom, though circumstantial, are sufficient to support a finding that Putney operated his vehicle while in an intoxicated condition at the time of the accident, we affirm the judgment of the trial court.

## Factual and Procedural History

On January 26, 2012, Putney went to Arena Bar for lunch around noon. Arena Bar was located at the 5600 block of West Park in the City of St. Louis. Lisa Kehm ("Kehm") owned the bar with her husband. Kehm waited on Putney that day. Kehm recognized Putney as she had known him for twenty years, was one of his good friends, and Putney was a regular customer at the bar. Kehm served Putney two cans of Pepsi and lunch. Kehm denied serving Putney any alcohol. Kehm also stated that no one else served Putney alcohol while she was at the bar. Kehm left the bar after her shift, which ended about 2:00 or 2:30 P.M. Putney was still at the bar when Kehm left. Putney's credit-card receipt from that afternoon was timestamped at 4:11 P.M. While the receipt was not itemized, Kehm testified that Putney's lunch would have cost $10, and his two sodas were $2 each, for a total of around $14. According to the receipt, Putney's bill was $33.40. At the time, a glass of beer was $3, and mixed drinks were $4.25. There was no testimony as to what Putney consumed after Kehm left around 2:30 P.M.

Putney was later seen a short distance away at St. James the Greater Catholic Church, in the Dogtown neighborhood of the City of St. Louis, coaching youth basketball. Putney conducted the practice in his dress shirt, dress slacks, and dress shoes. Susan Faccaro ("Faccaro"), the mother of a child on the team, was at the practice and noticed Putney demonstrating basketball moves. At one point, Faccaro saw her son on the ground and Putney standing over him. Another time, she saw Putney blocking Emeric, another boy on the team, to the ground. Faccaro noticed Putney was having an obvious problem with his balance during the practice and was more "aggressive" and "physical" with the ten-year-old boys than usual. In a discussion after practice, Faccaro found Putney to be more "happy" and "excitable" than usual, though she had only talked to him a few times. Putney was talking fast and repeating himself. Faccaro thought Putney was "acting weird." Faccaro and Chris Prichard (another parent) pulled

2

Emeric's father, Joseph Finn ("Finn"), aside. According to Finn, Faccaro and Prichard "brought up that they thought [Putney] perhaps was intoxicated." Finn was not at the basketball practice but he arrived after practice to pick up his son. Finn interacted with Putney and noticed a "tint" of alcohol on Putney's breath. Finn did not notice anything unusual about his demeanor and did not believe Putney was drunk. Putney told another basketball coach that he was going back to Arena Bar at approximately 5:35 P.M.

Eliza Coriell ("Coriell") was also a server at Arena Bar. Coriell testified that she started her shift around 6:15 P.M. She could not remember whether Putney was there when she began her shift. Coriell did not serve Putney any drinks, but did remember serving him water. Coriell did not notice anything unusual. At some point, Putney left Arena Bar and stopped by Jack in the Box. A Jack-in-the-Box receipt found in Putney's vehicle was timestamped at 7:23 P.M.

At approximately 7:35 P.M., Kayla Taylor ("Taylor") was driving eastbound on Clayton Road, near Mason Road in west St. Louis County. Taylor saw a sudden movement from a westbound vehicle. The westbound vehicle, a GMC Envoy, travelled into the eastbound lane. Taylor did not see the actual collision because her view was obscured by the vehicle in front of her, but the westbound Envoy collided with an eastbound Volvo in the eastbound lane. Mark Cusumano ("Cusumano") was a passenger in a vehicle near the scene. Cusumano immediately exited his vehicle and approached the accident scene. The driver of the Volvo ("Victim") was nonresponsive. Cusumano testified that the driver of the Envoy repeatedly tried to start his engine. Concerned that starting the Envoy would ignite spilled fluids at the accident scene, Cusumano yelled at the driver to stop. Several other bystanders also attempted to stop the driver. The driver managed to start his engine and drove westward, slowly. The driver nearly hit Cusumano's vehicle while leaving the scene. Cusumano identified Putney as the driver.

3

Putney drove for a short distance westbound on Clayton Road until he again crossed over the center line. Putney's vehicle came to a rest, facing westbound, in a drainage ditch on the eastbound side of the road. Three witnesses testified that they saw Putney around this time. Joshua Levey ("Levey") knew Putney personally through business. Levey first saw Putney in his vehicle just after the accident; Putney appeared to be driving away. Levey, who made a U-turn to go a different route because traffic blocked the road, noticed the same vehicle stopped on the side of the road. Andrew Purtell ("Purtell") was also a motorist in the area. He noticed a man in dark pants and a dress shirt running away from the accident on the side of the road towards Weidman Road. Purtell had to swerve to avoid hitting the man. Kathleen Kramer-Smith ("Kramer-Smith") was headed east on Clayton at around 8:00 P.M. Kramer-Smith noticed a man in a grassy area wearing a dress shirt and slacks. Kramer-Smith testified:

> Well, what caught my attention mainly was the manner in which [the man] was moving. He was very—[h]e seemed distressed, and he was moving in a rather awkward fashion. His hands were kind of up, like he was bracing for a fall. Not real controlled is what I thought. And there was kind of a teetering in his walk, a fast-paced walk. … Side to side.

Police officers arrived on the scene about 7:40 P.M., roughly five minutes after the accident. The officers found the Volvo still sitting in the eastbound lane on Clayton Road, and they found the Envoy a short distance away in a drainage ditch. Police found Victim inside the Volvo. Victim was nonresponsive at the scene, and was pronounced dead at the hospital. The cause of death was blunt trauma to the chest.

Detectives, accident reconstructionists, and crime-scene technicians soon arrived to reconstruct the scene. Road conditions were dry that night. The technicians found fluid spots at the scene of the accident. The Volvo had heavy front-end damage. The Envoy also had significant front-end damage, but the tires were still inflated and in good condition. The speed limit on Clayton Road, a two-lane road with little shoulder, was thirty-five miles per hour.

4

Detectives searched the Envoy's crash data retrieval system, which revealed that the Envoy was travelling at forty-two miles per hour at the time of the crash. No brakes were applied in the eight seconds leading up to the crash. The crash data retrieval system also showed constant pressure on the throttle; there was no increase or decrease in pressure on the throttle in the seconds before the crash.

The team processed the rest of the scene around the Envoy, which was mired in mud. A single dress shoe was found lying on the ground. Inside the Envoy, officers found Putney's wallet, a hamburger, onion rings, and other items from Jack in the Box. As mentioned above, the receipt from Jack in the Box was timestamped at 7:23 P.M. The interior of the Envoy smelled of alcohol and airbag material. The team also found a styrofoam cup in the middle console, which contained a pink liquid. The cup resembled the cups used by Arena Bar. Emily Smelser ("Smelser"), a criminalist with the Missouri State Highway Patrol Crime Lab, conducted an alcoholic beverage analysis on the pink liquid inside the cup. The results of the liquid were 5.41% ethanol by volume positive, and 4.31% by weight. These measurements allowed Smelser to conclude that the liquid inside the cup was an alcoholic beverage, though the testing could not specify the type of alcohol.

Officers ran the plates on the Envoy and determined that it was registered to Putney. Officers were immediately dispatched to Putney's residence. Putney was not home. Putney's wife answered the door and agreed to call Putney. Putney answered his cell phone and talked to Officer Janet Nisbet ("Officer Nisbet"). Putney assured Officer Nisbet that he was nearby, and that he would come home. About an hour later, Putney's wife called him again. Putney answered, said he did not need a ride, and hung up after his wife asked him when he was coming home. Officers waited at Putney's house for four hours, but Putney never came home. At 10:56

5

P.M., Putney called police in response to urgent voicemail messages police left on his cell phone. Putney told the officers he would turn himself in, but not until later, and hung up.

Police were able to "ping" Putney's cell phone. The phone's location was near Putney's brother's house in south St. Louis County. When police arrived at Putney's brother's house, the lights were on inside the house. Police knocked on the door and a male voice asked, "Who is it?" When police identified themselves, no one responded and the inside lights turned off.

Putney went back to Arena Bar the next morning. Kehm (the bar owner) allowed Putney to use the office phone for about 45 minutes, in private. When asked what was wrong, Putney told Kehm that "something terrible occurred." Three days after the accident, on January 29, 2012, Putney turned himself into police. The State charged Putney with two counts: leaving the scene of a motor vehicle accident (Count I), and first-degree involuntary manslaughter (Count II). Putney waived a jury trial. At trial, Putney did not testify or present any evidence. The trial court found Putney guilty on both counts. The court denied Putney's post-trial motion for judgment of acquittal. The trial court sentenced Putney to four years on Count I and ten years on Count II. The sentences were run concurrently. Putney filed his timely notice of appeal on December 16, 2014. This appeal follows.

## Point on Appeal

In his sole point on appeal, Putney argues that the trial court erred in overruling his motion for judgment of acquittal on Count II, first-degree involuntary manslaughter. Specifically, Putney maintains that the State did not present evidence sufficient to prove beyond a reasonable doubt that Putney was operating a motor vehicle while intoxicated. Putney contends there was insufficient evidence to prove that he was ever intoxicated on January 26, 2012. Even if such evidence existed, Putney argues the evidence was not sufficient to show he was intoxicated at the time of the collision with Victim.

6

## Standard of Review

The standard of review for a challenge to the sufficiency of the evidence in a court-tried criminal case is the same as in a jury-tried case. State v. Fortner, 451 S.W.3d 746, 755 (Mo. App. E.D. 2014). We view the evidence in the light most favorable to the State. State v. Grim, 854 S.W.2d 403, 411 (Mo. banc 1993). We grant the State all reasonable inferences from the evidence. Id. In doing so, we will not supply missing evidence or give the State the benefit of unreasonable, speculative, or forced inferences. State v. Langdon, 110 S.W.3d 807, 811–12 (Mo. banc 2003). Conversely, we disregard all contrary inferences, unless the inferences are "such a natural and logical extension of the evidence that a reasonable [fact finder] would be unable to disregard them." Grim, 854 S.W.2d at 411. In considering whether the State presented sufficient evidence to sustain a conviction, we consider each of the elements in turn. Id. Viewing the evidence in this light, the issue becomes "whether a reasonable [fact finder] could find each of these elements beyond a reasonable doubt." Id.

## Discussion

Involuntary manslaughter has several forms under Section 565.024.[1] The form of involuntary manslaughter charged by the State against Putney occurs when the defendant "[w]hile in an intoxicated condition operates a motor vehicle ... and, when so operating, acts with criminal negligence to ... [c]ause the death of any person not a passenger in the vehicle ... operated by the defendant." Section 565.024.1(3)(a). Putney does not contest that he was driving his Envoy when he struck Victim's vehicle, that he acted with criminal negligence, or that he caused Victim's death. Putney challenges the trial court's finding that the State presented

---

[1] All statutory references are to RSMo (2000).

7

sufficient evidence to prove beyond a reasonable doubt that Putney was in an intoxicated condition while driving the Envoy when it struck the Volvo and killed victim.

"'Intoxicated condition' means under the influence of alcohol, a controlled substance, or drug, or any combination thereof." Section 565.002(4). Stated differently, a person is in an intoxicated condition when "his use of alcohol impairs his ability to operate an automobile." State v. Schroeder, 330 S.W.3d 468, 475 (Mo. banc 2011). The State cannot prove the required element of operating a vehicle while intoxicated under Section 565.024 without also proving driving while intoxicated ("DWI") under Section 577.010. See State v. Sondermann, 812 S.W.2d 275, 275–76 (Mo. App. E.D. 1991) (Section 577.010 is a lesser-included offense of involuntary manslaughter Section 565.024.1(2), which has the same "while in an intoxicated condition operates a motor vehicle" element as Section 565.024.1(3) at issue here). Thus, DWI cases reviewing issues relating to the sufficiency of the evidence provide guidance for our analysis of the evidence of Putney's condition while operating his vehicle.

In matters of alcohol intoxication, evidence of intoxication sufficient to sustain a conviction may be introduced through the testimony of lay witnesses who had a reasonable opportunity to observe the alleged offender. State v. Meanor, 863 S.W.2d 884, 887 (Mo. banc 1993). While helpful, the State need *not* produce the results of a chemical test to prove intoxication. State v. Hall, 201 S.W.3d 599, 603 (Mo. App. S.D. 2006). Intoxication may be proven through circumstantial evidence. State v. Neal, 979 S.W.2d 223, 225 (Mo. App. S.D. 1998); see also State v. Jackson, 439 S.W.3d 276, 278 (Mo. App. E.D. 2014) ("Circumstantial evidence alone can be sufficient to support a conviction"). Circumstantial evidence means evidence that does not directly prove a fact, but it gives rise to a logical inference that the fact exists. State v. Mayfield, 83 S.W.3d 103, 107 (Mo. App. S.D. 2002).

8

The facts presented in the record before us each support certain inferences of intoxication. The trial court found the evidence and corresponding inferences sufficient to prove Putney's intoxication at the time he drove his Envoy into the Volvo, killing the driver. We note that the facts before us also support logical counter-inferences that do not necessarily point to Putney's intoxication. Our limited standard of review requires us to reject these counter-inferences unless they are "such a natural and logical extension of the evidence that a reasonable [fact finder] would be unable to disregard them." Grim, 854 S.W.2d at 411. It is well settled that this Court neither weighs the evidence nor determines any witness's credibility. State v. Williams, 18 S.W.3d 425, 427 (Mo. App. S.D. 2000). That role remains within the exclusive province of the trier of fact—in this case, the trial court. Our purpose is to ensure that the determinations made by the trial court are reasonable, not to second guess them. Acknowledging our standard of review in this appeal, the facts and fairly-drawn inferences, viewed in the light most favorable to the State, are as follows.

I.    **The trial court could reasonably infer that Putney was drinking at Arena Bar during the afternoon of January 26, 2012.**

Putney arrived at Arena Bar on January 26, 2012 around noon for lunch. Putney remained at Arena Bar for approximately four hours, until at least 4:11 P.M., when his receipt was timestamped. The receipt was not itemized, but Putney's total bill was $33.40. According to Kehm (the bar owner and server that day), Putney's lunch and two sodas cost $14 total, leaving about $19.40 unaccounted. Kehm left the bar at around 2:30 P.M. Shortly after Putney left Arena Bar, he was seen coaching a youth basketball team at a nearby school. Finn was picking up his son at the practice at 5:30 P.M. and smelled a "tint" of alcohol on Putney. Given the unaccounted-for bar bill and the "tint" of alcohol on Putney shortly thereafter, the trial court

9

reasonably could have inferred that Putney consumed alcohol at Arena Bar sometime after Kehm left around 2:30 P.M. and before the start of basketball practice.

**II.    The trial court reasonably could have inferred that Putney was intoxicated to some degree during the basketball practice.**

Faccarro noticed that Putney was more "aggressive" and "physical" with the ten-year-old boys than usual, and that Putney was having obvious problems with his balance. In a discussion after practice, Faccaro found Putney to be more "happy" and "excitable" than usual, talking fast and repeating himself, and "acting weird." Faccaro and Prichard expressed concerns to Finn, another parent, that Putney was intoxicated. Finn smelled a "tint" of alcohol when talking to Putney.[2] An odor of alcohol and balance problems are indicators of intoxication. State v. Hatfield, 351 S.W.3d 774, 776 (Mo. App. W.D. 2011). From this evidence, the trial court could have inferred that Putney had some level of intoxication at 5:30 P.M. when the basketball practice ended.

**III.    Putney's actions after basketball practice and immediately prior to the accident support an inference that Putney continued drinking prior to the accident.**

Evidence of Putney's continued intoxication following basketball practice is critical to the State meeting its burden of proof. To sustain Putney's conviction for involuntary manslaughter, we must find sufficient evidence from which the trial court reasonably could have inferred that Putney remained in an intoxicated condition after leaving basketball practice. When practice ended at 5:30 P.M., Putney, who already had some level of intoxication, returned to Arena Bar. We note the lack of any direct evidence that Putney consumed alcohol during his second visit to the bar. We agree with Putney that the lack of direct evidence as to his conduct

---

[2] In its credibility determination, the trial court could have reasonably believed Finn was understating Putney's level of intoxication, since Putney and Finn had known each other for over 30 years.

10

after 5:30 P.M. presents a substantial challenge to the State in meeting its burden of proof. This challenge, while daunting, is not insurmountable.

We reject the notion that Putney's return to Arena Bar to consume alcohol is unreasonable, speculative, or a forced inference. The trial court could reasonably conclude that Putney did not return to Arena Bar to eat dinner because the evidence showed that Putney bought food at Jack in the Box after leaving the bar. Second, the styrofoam cup found in Putney's Envoy after the accident contained an alcoholic beverage,[3] and the cup was similar in appearance to the cups used to serve alcohol at Arena Bar. The photograph of the partially filled cup introduced into evidence appears to show the cup with a mixed drink of some type. This evidence supports a reasonable inference that Putney continued drinking at Arena Bar that evening, and was consuming a beverage containing hard liquor as opposed to beverages with a lower alcohol content.[4] Moreover, the police officers reported the smell of alcohol in Putney's car when responding to the accident. At this point, the circumstantial evidence supports a reasonable inference, beyond a reasonable doubt, that Putney was drinking alcohol prior to the accident.

IV.     **Other circumstantial evidence supports an inference that Putney was in an intoxicated condition at the time of the accident.**

When viewed in a light most favorable to the State, the record contains additional circumstantial evidence also supporting a reasonable inference that Putney was driving his car in an intoxicated condition at the time of the accident. Intoxication is often evidenced by

---

[3] The pink liquid in the cup tested positive for ethanol.

[4] The liquid was found to contain 5.41% ethanol by volume. In State v. Davis, 217 S.W.3d 358, 361 (Mo. App. W.D. 2007) it was held that the presence of empty beer cans in a vehicle did not establish or imply that a driver was intoxicated while driving, particularly when the driver was not the only occupant in the vehicle. However, the open styrofoam cup containing alcohol in Putney's car, coupled with the other factual evidence, supports a reasonable inference that Putney continued to consume alcohol at Arena Bar following basketball practice.

11

"unsteadiness on the feet, slurring of speech, lack of body coordination and an impairment of motor reflexes." Hall, 201 S.W.3d at 603 (internal quotations omitted). Further, erratic, high-speed driving can provide some degree of evidence of a driver's intoxication. See State v. Teague, 64 S.W.3d 917, 921 (Mo. App. S.D. 2002); State v. Middaugh, 802 S.W.2d 570, 572 (Mo. App. W.D. 1991).

Putney demonstrated an obvious impairment of motor reflexes and lack of coordination while driving his Envoy. The evidence showed that Putney was driving erratically and at an excessive speed. Although road conditions were not wet or icy, Putney inexplicably crossed over the center line into oncoming traffic. Evidence showed that Putney crossed the center line traveling forty-two miles per hour in an area where the speed limit was thirty-five. Not only was Putney speeding, but the evidence showed he made no effort to slow down or maneuver away from the Volvo before he crashed. Putney did not apply the brakes in the eight seconds before the collision. The evidence shows constant pressure was applied to the throttle. The record lacks any evidence that Putney made any attempt to avoid the crash. The trial court reasonably could have concluded that Putney, if he was not intoxicated, would have been alert to the danger and had the coordination and motor skills required to brake before the collision, or at least attempt to apply the brakes or veer away from the oncoming Volvo. The fact that Putney was driving westbound while entirely in the eastbound lane, and accelerating rather than braking upon impact—coupled with the previous evidence about Putney's afternoon at the bar, conduct at the youth basketball practice, and his return to Arena Bar—supports a reasonable inference that Putney was intoxicated at the time of the accident.

12

## V. Putney's conduct following the accident further supports an inference of intoxication.

Additional evidence of intoxication may also be reasonably inferred from Putney's actions following the collision. This accident was not a minor collision. Both cars sustained major damage. Immediately after the collision, Putney repeatedly attempted to restart the engine of his mangled vehicle, despite bystanders urging him to stop. While leaving the scene, Putney nearly collided with another vehicle. Putney drove a short distance when he crossed the center line *again* and landed in a drainage ditch. When officers discovered Putney's vehicle, they noticed an odor of alcohol inside the vehicle and a styrofoam cup in the car containing alcohol. Viewed in the light most favorable to the verdict, this evidence of reckless and erratic driving during and immediately after the accident, the odor of alcohol in the vehicle, and a cup containing alcohol inside the vehicle is circumstantial evidence reasonably consistent with intoxication while driving. See State v. Varnell, 316 S.W.3d 510, 516 (Mo. App. W.D. 2010) ("the circumstances of an accident, when coupled with other supporting evidence and interpreted in the light most favorable to the judgment, can provide additional competent evidence of drunk driving").

Further, witnesses' testimony by those who saw Putney after he exited his vehicle supported an inference of intoxication. The testimony at trial indicated that Putney ran away from the scene in a dress shirt and slacks, wearing only one shoe on a January evening. At this time Putney was moving "kind of awkwardly," holding his arms up as if "bracing for a fall," and teetering from side to side as he ran. Coupled with the previously discussed evidence, Putney's unsteadiness on his feet, lack of coordination while running away, and leaving one shoe behind in January supported a reasonable inference that Putney was intoxicated in the minutes immediately after the accident. See Hall, 201 S.W.3d at 603.

13

## VI. Other Considerations

We reiterate that the inferences discussed above are not the *only* reasonable inferences that a trier of fact might have drawn from the State's evidence. A trier of fact might reasonably have found that Putney spent the afternoon at Arena Bar without consuming an amount of alcohol to cause intoxication. Putney could have stumbled at basketball practice for reasons other than intoxication. Putney might not have returned to Arena Bar for the purpose of consuming alcohol. Putney might have returned to the bar for a number of reasons. Maybe he left something at the bar earlier that day. With regard to the collision, Putney might have been distracted by his cell phone; he might have dropped the food he was eating. Putney's unsteadiness following the accident may have been due to injuries he suffered in the accident. While these are *reasonable* counter-inferences that might explain what occurred, our standard of review precludes us from substituting such inferences with the reasonable inferences drawn by the trier of fact.

Important to our resolution of this appeal, evidence is sufficient to support guilt if *any* reasonable inference supports guilt, even if other "equally valid" inferences do not. State v. Mosby, 341 S.W.3d 154, 156 (Mo. App. E.D. 2011); see also State v. Chaney, 967 S.W.2d 47, 54 (Mo. banc 1998) (recognizing that the "equally valid inferences" rule was abolished by Grim, 854 S.W.2d at 413–14). Adhering to our standard of review, we must disregard inferences unfavorable to the State. We are not persuaded that the counter-inferences maintained above are "such a natural and logical extension of the evidence that a reasonable [fact finder] would be unable to disregard them." Grim, 854 S.W.2d at 411. While any individual piece of evidence may be insufficient to sustain the State's burden of proof, each individual inference is reasonably drawn from evidence in the record. The individual pieces of evidence and inferences therefrom build a convincing chain of inferences leading to the reasonable conclusion that Putney was

14

intoxicated while operating his vehicle at the time of the accident. Putney's argument that the inferences drawn by the trial court are unreasonable, speculative, or forced is unavailing. Moreover, we reject Putney's argument that the trial court supplied the missing evidence of his intoxication. The record contains evidence of alcohol consumption, some degree of intoxication as of 5:30 P.M., and an open cup containing an alcoholic beverage in the vehicle that Putney was erratically driving when he crashed into the Volvo two hours later. Putney's evidence of alcohol consumption and intoxication is not missing from the record. The evidence before us reasonably could lead the trier of fact to find that Putney was intoxicated at the time of the accident.

Putney argues that the State failed to temporally connect Putney's alleged intoxication to his actual operation of a motor vehicle, citing State v. Hatfield, 351 S.W.3d 774 (Mo. App. W.D. 2011) as support. In Hatfield, an officer was dispatched to an accident. Id. at 775. When the officer arrived, Defendant was standing outside his vehicle, which was damaged. Id. at 775–76. Defendant said, "I lost it making the turn." Id. at 776. The officer noticed "multiple indicators" that Defendant was intoxicated, including a strong odor of alcohol, slurred speech, and balance problems. Id. Defendant did not dispute (1) that he drove the vehicle at some point before the officer arrived or (2) that he was intoxicated when the officer arrived. Id. at 777. The court reversed the conviction because there was no evidence as to the approximate time that Hatfield was operating the vehicle or the time the accident occurred, or how much time elapsed between the accident and the arrest (when there was evidence of intoxication). Id. at 780. Because it was impossible to determine from the record the approximate time that Hatfield last operated the

vehicle, the court held that the State failed to temporally connect Hatfield's intoxication to his operation of the vehicle. Id.[5]

Unlike Hatfield, the evidence clearly proved Putney was driving the Envoy when it crashed into the Volvo. The only issue is whether Putney was intoxicated at the time. The State presented evidence suggesting that Putney was intoxicated before, during, and after the collision. The State presented evidence that the accident occurred on January 26, 2012, between 7:35 and 7:40 P.M. Witness Cusumano identified Putney as the driver who crashed and drove away from the scene. Witnesses saw Putney immediately after the collision running away from his vehicle. As explained above, the State presented circumstantial evidence that would allow a reasonable fact finder to infer that Putney was intoxicated this entire time. Unlike Hatfield, the State temporally connected Putney's intoxication to his operation of a motor vehicle by presenting evidence that established the approximate time of the accident, that Putney was driving his vehicle, and that Putney was intoxicated.

Putney's challenge to his conviction is premised on his contention that the conviction resulted soley from evidence of inference after inference built upon one another in such a manner that the evidence lacks a factual foundation and cannot lawfully support the trial court's judgment. We find this argument unavailing.

We are mindful of Missouri cases referencing a rule prohibiting "piling inference upon inference" or "inference stacking." See, e.g., State v. Ring, 141 S.W.2d 57, 65 (Mo. banc 1940); State v. Lottie, 648 S.W.2d 908, 910 (Mo. App. W.D. 1983). The inference stacking rule prohibits an inference "where an initial inference is drawn from a fact, and other inferences are

_____

[5] Putney also cites State v. Davis, 217 S.W.3d 358 (Mo. App. W.D. 2007). Davis does not stand for any proposition materially different than Hatfield.

16

built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact." Wills v. Berberich's Delivery Co., 134 S.W.2d 125, 129 (1939). This rule against pyramiding inferences is *not* a general rule applying to all situations, but a "rule of reason applied in the trial court's discretion to guard against attenuated reasoning." Hale v. Am. Family Mut. Ins. Co., 927 S.W.2d 522, 527 (Mo.App. W.D. 1996); see also State v. McMullin, 136 S.W.3d 566, 572 (Mo. App. S.D. 2004) (a verdict cannot rest upon the piling of inferences when there are no facts supporting the first inference). However, it is "well settled that any number of inferences may be drawn in a given case so long as each has a factual foundation." Wills, 134 S.W.2d at 129. The underlying question is whether the inference "can fairly be drawn from the proven facts by reasonably intelligent minds." State v. McMullin, 136 S.W.3d 566, 572 n.5 (Mo. App. S.D. 2004) (quoting Wills, 134 S.W.2d at 129).

The presence of parallel inferences consistent with guilt may be sufficient to support a finding of guilt. State v. Lottie, 648 S.W.2d at 911. The existence of multiple, parallel inferences does not undermine the fact finder's verdict provided the inference is reasonably drawn from facts established by proof. Id. Here, the inferences supporting a finding of Putney's intoxication while driving are derived from direct factual evidence introduced a trial. The trial court reasonably could infer that Putney drank alcohol while at Arena Bar in the afternoon prior to the accident given the factual evidence of his presence at Arena Bar for almost the entire afternoon, the bill from Arena Bar, and his condition after leaving Arena Bar and appearing at basketball practice shortly thereafter. It was reasonable for the trial court to infer that Putney was intoxicated at the youth basketball practice from the direct testimony of witnesses present at the practice. Further factual evidence allowed a reasonable inference that Putney drank more alcohol at Arena Bar after the basketball practice. An open cup of a drink containing 5.41%

17

alcohol was in the Envoy, within Putney's reach when he crashed the car. This evidence, when considered with the direct evidence of Putney's reckless and erratic driving and his problems with balance and motor skills in the minutes after the accident provides a factual foundation from which the trial court reasonably could infer that Putney was intoxicated at the time of the accident. Each separate and parallel link in the chain of inferences was fairly drawn from the facts in evidence, and is to be viewed in a light most favorable to the State. The fact that Putney suggests other plausible explanations and inferences for his conduct does not detract from the reasonableness of the inferences and conclusions made by the trier of fact. Moreover, whether we or any other trier of fact would have drawn different inferences in the first instance than the trial court is not the issue on appeal. The only issue is whether the trier of fact acted reasonably in drawing such inferences from the factual evidence before it.

Because the State presented sufficient circumstantial evidence from which the trial court reasonably could infer that Putney was in an intoxicated condition, beyond a reasonable doubt, at the time of the collision, the trial court did not err in denying Putney's motion for judgment of acquittal.

## Conclusion

The decision of the trial court is affirmed.

KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
Patricia L. Cohen, J., concurs.

18