

# In the Missouri Court of Appeals
# Eastern District

DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102010 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Francois County |
| v. | ) | |
| | ) | |
| FARRELL WAYNE CROSS, | ) | Honorable Sandra Martinez |
| | ) | |
| Defendant/Appellant. | ) | Filed: May 3, 2016 |

## Introduction

Farrell Wayne Cross (Appellant) appeals from the trial court's judgment entered upon a jury verdict convicting him of first-degree murder. We affirm.

## Factual and Procedural Background

Appellant does not contest the sufficiency of the evidence to support his conviction. The evidence, viewed in the light most favorable to the verdict, is as follows.

Appellant and Victim were married in the early 1980s and had one daughter. In the mid-1980s, Appellant and Victim divorced. Victim was awarded custody of their daughter, and Appellant was ordered to pay child support, which he refused to pay.

In June 1989, the Missouri Division of Child Support Enforcement intercepted Appellant's tax refund for past due child support. Shortly thereafter, Appellant approached an acquaintance, Delbert Smith (Smith), and offered to kill Smith's wife if Smith killed Victim. Appellant knew Smith's wife had been cheating on him while

Smith was in prison and Appellant told Smith he wanted Victim dead because he did not want to pay child support. Smith declined. In the following months, Appellant solicited Smith and Smith's associate, Bobby Sharp (Sharp), several times to kill Victim.

In the meantime, Appellant and his wife, Becky Cross, were charged with assaulting Victim and her friend on June 24, 1990. A hearing occurred on January 24, 1991, 10 days before Victim was murdered, at which a trial date was set for May 9, 1991. After the Victim's murder, the cases were dismissed.

In late 1990, Appellant went to Smith's trailer and gave Smith $1,000 in cash. Smith declined the "contract" and, instead, delivered the money to Sharp at Appellant's request. A week or two later, Appellant gave Sharp a plastic bag of white powder, which Appellant stated contained cyanide.

Shortly before Victim's murder, Appellant was at a bar with his brother-in-law, Jimmy Jolliff (Jolliff). During the conversation, Appellant pulled a small .22 caliber semi-automatic pistol from a waist holster and showed it to Jolliff.

On January 23, 1991, eleven days before Victim was murdered, Appellant's wages were garnished for child support. Shortly after Victim's death, the garnishment order was terminated and the child support case closed.

Appellant frequently complained about visitation and child support to his friend, Tom Lortz (Lortz), who was experiencing similar issues with his ex-wife. About seven to ten days before Victim's murder, Appellant and Lortz were at the Eagles Lodge where Appellant was complaining about Victim. Appellant offered to kill Lortz's ex-wife if Lortz would kill Victim. When Lortz stated he was not interested in having his ex-wife killed, Appellant offered him $3,000. Lortz again declined.

2

Lortz knew Appellant carried a .22 caliber semi-automatic pistol in his boot and a .22 caliber rifle in his van at all times. Appellant drove a 1977 Ford van with two-tone blue paint.

A year or two after Victim's murder, Lortz and Appellant were at the Eagles Lodge with a group of people. At one point in the conversation, Appellant looked directly at Lortz, grinned, and said, "Some people can get away with murder."

On the evening of February 2, 1991, Victim was at Perry's Pool Hall in Newburg with her friends Catherine Light Warren (Warren), Brenda Nash (Nash), and Danna Yelton (Yelton). Appellant and Sharp were also at the bar. Victim told her friends she wanted to meet up with Appellant that night and intended to proposition him. Victim then approached Appellant and engaged in a long conversation. Victim bought Appellant a beer with the garnished child support check she had received the day before, and Appellant stated "he didn't want the beer, he wanted the damn money."

Later that evening, Sharp purchased a can of beer for Victim. Sharp produced a bag containing white powder from his jacket and poured the contents of the bag into the beer. Sharp delivered the beer to Victim, returned the remaining powder to Appellant and left the bar. The bartender, Janet Daniels (Daniels), noticed the transaction and confronted Appellant, and Appellant told Daniels, "It [is] none of [your] damn business."

Victim then joined Warren and Nash outside. When Victim took a drink of the beer, she instantly spit it out. Victim said there was something in the beer and it tasted like strychnine. Warren and Nash each took a drink of the beer and also spit it out because the beer was gritty, foamy, bitter, and tasted like baking soda.

3

Around 11 p.m., Victim told Nash and Daniels she was going to Three Mile Road. As she was leaving, Victim talked with Appellant, who told Victim that "if she did not quit fussing with him he wasn't going to meet her." Victim then got in her car headed out of town going south on T Highway toward Three Mile Road.

Approximately 30 to 45 minutes later, Appellant left the bar and got into his Ford van. Appellant drove south on T Highway. Around 11:45 p.m., Tammy Foster and her mother, Barbara Foster, saw Appellant's van turn onto Three Mile Road, where Victim was waiting in her car. Appellant pulled the driver's side of his van next to the driver's side of Victim's car, as if they were going to meet.

The next day, Victim's body was found lying next to her car parked just off Three Mile Road, located in Mark Twain National Forest within Phelps County, Missouri. Victim had a small caliber gunshot wound to her left temple. Police recovered from Victim's brain a .22 caliber hollow point, copper jacketed bullet consistent with CCI .22 caliber ammunition.

On the day Victim's body was found, police went to Appellant's residence and asked to see his guns. From his van, Appellant retrieved a Winchester .22 caliber rifle, which was loaded with one round of CCI .22 caliber hollow point, copper jacketed ammunition. Investigators recovered a loose round of CCI .22 caliber hollow point, copper jacketed ammunition from the floorboard of the van. From his trailer, Appellant produced a Mossberg .22 caliber rifle and a Ruger .22 caliber revolver that was loaded with six rounds of CCI .22 caliber hollow point, copper jacketed ammunition. Forensic evidence excluded the guns as the murder weapon.

4

On February 13, 1991, police arrested Appellant for Victim's murder and Appellant was detained in the Phelps County Jail. Appellant approached Murl Payne (Payne), an inmate who had recently litigated the reversal and remand of his own murder conviction, and asked Payne for legal advice. During their discussion, Appellant admitted he ran into his ex-wife at a bar one night, followed her in his van, pulled over on a country road, and shot her. Appellant said he left her body on the country road. Appellant said he shot his ex-wife because he was behind on child support and she was "bugging" him about it. Appellant told Payne he was concerned because two women named "Foster" drove by but stated they did not see him shoot his ex-wife.

On April 28, 2011, the State charged Appellant with one count of murder in the first degree. The jury found Appellant guilty as charged and the trial court sentenced Appellant to life imprisonment without parole. This appeal follows.

On appeal, Appellant raises points related to jurisdiction, the prosecutor's statements during trial and closing argument, the prosecutor's use of leading questions, and the admission of evidence.

## Discussion

### Point I – Jurisdiction

In his first point on appeal, Appellant contends the St. Francois County circuit court lacked subject matter jurisdiction over this case because the homicide occurred in Mark Twain National Forest, within which the federal government enjoys exclusive jurisdiction for the prosecution of criminal offenses.

Subject matter jurisdiction is the authority of a court to hear and decide a case. Missouri circuit courts have subject matter jurisdiction over criminal cases under Article

5

V, Section 14 of the Missouri Constitution. State ex rel. Laughlin v. Bowersox, 318 S.W.3d 695, 698 (Mo. banc 2010). The State cannot grant subject matter jurisdiction to its courts to hear matters federal law places under the "exclusive" jurisdiction of the federal courts. Id. When the facts are uncontested, the determination of the court's authority to hear a case is purely a question of law that is reviewed *de novo*. State ex rel. SLAH, L.L.C. v. City of Woodson Terrace, 378 S.W.3d 357, 361 (Mo. banc 2012).

In Hankins v. State, 766 S.W.2d 467 (Mo. App. S.D. 1989), the Southern District specifically addressed the question of whether the State of Missouri has jurisdiction to prosecute a homicide that occurred within Mark Twain National Forest and concluded the State had such authority. Prior to 1940, whether the United States accepted a State's cession of jurisdiction over lands acquired by the United States was a question of fact. Id. at 469. In the absence of evidence to the contrary, it was presumed the federal government accepted jurisdiction. Id.

The Weeks Act, 16 U.S.C. § 480, however, provides a state does not lose jurisdiction "over persons within national forests":

> The jurisdiction, both civil and criminal, over persons within such forest reservations [national forests] shall not be affected or changed by reason of the existence of such reservations [national forests], except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning, of this provision being that the State wherein any such reservation [national forest] is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

16 U.S.C. § 480 establishes the federal government's refusal to accept exclusive jurisdiction over a national forest. Hankins, 766 S.W.2d at 469. Pursuant to this statute,

6

the establishment of the Mark Twain National Forest did not divest the State of Missouri of jurisdiction to prosecute criminal offenses as proscribed by state statute.

Furthermore, on February 1, 1940, Congress amended 40 U.S.C. § 255 to add the following:

> Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. *Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.*

(Emphasis added.)  Pursuant to § 255, it is conclusively presumed the federal government has not accepted jurisdiction over any land acquired by it on or after February 1, 1940, unless the federal government affirmatively accepted such jurisdiction by filing the appropriate notice.

The U.S. government acquired the land to establish Mark Twain National Forest on September 8, 1941, and there is no evidence the U.S. government has filed the appropriate notice accepting federal jurisdiction over the forest.  Thus, pursuant to 40 U.S.C. § 255, the State of Missouri retained jurisdiction over the land and has the authority to prosecute this crime.  Hankins, 766 S.W.2d at 469-70.  Appellant's Point I is denied.

7

At trial, Payne testified Appellant admitted to Payne that Appellant followed his ex-wife in his van, shot her on a country road, and left her body there. On cross-examination, defense counsel elicited that Payne took this information to the Phelps County jailer in 1991 and requested a deal with "90-day shock" time in his own pending first-degree murder case. Payne subsequently pled guilty to second-degree murder and was sentenced to 15 years' imprisonment.

On redirect examination, the prosecutor asked Payne:

> Q. And you were sentenced to 15 years?
> A. Yes.
> Q. Is that right? Did that sentence have anything to do with the information provided on [Appellant]?
> A. No.
> Q. All right. You didn't get - - did you get anything for the information provided on [Appellant]?
> A. No, not nothing.
> …
> Q. All right. Did you ask [the jailer] to talk to the judge about [his request for 90-days of shock time]?
> A. Yes.
> Q. And for him to consider it?
> A. Yes.
> Q. And what did the judge do?
> A. He never mentioned it to me. I don't know what - -
> [Defense Counsel]: Objection, calls for hearsay…. There's no record of what a judge did or didn't do in that situation.
> [Prosecutor]: Well, Judge,…she intimated that somehow his murder was reduced because of this, which wasn't the case. And –
> [Defense Counsel]: Objection, Judge, could we approach?
> ...
> (Counsel approached the bench and the following proceedings were held:)
> [Defense Counsel:] I'm objecting to the State getting up and testifying that there was not a deal. I'm simply asking this witness did he ask for a deal, and then sometime after he asked for a deal his case got reduced from a murder first to a murder second.
> There's no record of whether it did or it didn't. I'm just asking him, was he seeking a deal? Yes. And then ultimately was your case

8

reduced? I never asked him if there was a deal or if this was part of the deal. I'm just saying that's how - -

…

[Prosecutor]: That's obviously the implication you're making that his murder case was reduced after that, after he gave the information. Now I've established through him that that didn't happen. And now what I'm asking is what happened to what he did request. And he knows that. He knows whether he got something.

The trial court overruled the defense's objection, finding the defense brought out the issue by alluding to Payne having received a deal. Upon defense counsel's request, the court directed the prosecutor not to lead the witness.

Q. [Prosecutor]: All right. Do you know what the Judge did with your request for that time?
A. I don't know that he give me anything
Q. He didn't give you anything?
A. Never mentioned it.
Q. Never got any deal. Is that fair?
A. That's fair.
Q. All right. As far as you know, did you ever get anything in return for the statement you gave about [Appellant]?
A. No, sir.
Q. And your testimony here today, are you getting anything in exchange for this?
A. No, sir.
Q. All right. And your statements in the past, did you get anything in exchange for those?
A. No.
Q. [Defense counsel] asked you about not having a lot of detail about this murder that [Appellant] told you about. Do you recall that?
A. Yeah.
Q. The information you had about the murder, where did you get that information from?
A. From him.
Q. That's your only source?
A. The only source I had.

During closing statements, defense counsel characterized Payne's testimony as "let's make a deal[,]" stating Payne was a snitch who wanted a deal for 90 days in jail on his first-degree murder case for providing information in Appellant's case. Counsel

argued that after Payne provided information on Appellant, Payne's first-degree murder charge was reduced to second-degree murder and he received a 15-year sentence. Defense counsel also argued Payne's testimony regarding Appellant's alleged confession lacked specific details about the crime that were not already available through other sources.

During the State's closing, the prosecutor stated Payne testified he did not receive anything in exchange for his testimony even though he hoped the judge would consider his request. In response to the defense's contention Payne's testimony lacked detail, the prosecutor argued Payne was "not making anything up. His only source, he testified…is [Appellant]."

On appeal, Appellant raises three points related to Payne's testimony. In Point II, Appellant argues the trial court erred in overruling his objection to the prosecutor's statement there had been "no deal" between the State and Payne during redirect examination because the statement bolstered Payne's credibility. In Point III, Appellant contends the trial court committed plain error in allowing the prosecutor to use leading questions during redirect examination of Payne to elicit testimony he had received no favorable treatment in his own pending murder case in exchange for his cooperation against Appellant because it constituted the prosecutor's personal assurance Payne had not received a deal and bolstered Payne's credibility. In Point IV, Appellant maintains the trial court plainly erred in allowing the prosecutor to argue Payne "got nothing, nothing, out of this," and that "he's not making anything up" during closing arguments because the statements, again, constituted the prosecutor's personal assurance Payne had not received a deal and bolstered Payne's credibility.

10

<u>Prosecutor's Statement of No Deal During Payne's Testimony</u>
<u>And Closing Argument</u>

Unsworn remarks of counsel in opening statements, during the course of trials or in arguments are not evidence of the facts asserted. <u>State v. Forrest</u>, 183 S.W.3d 218, 226 (Mo. banc 2006). Counsel may argue inferences justified by the evidence, but not inferences unsupported by the facts. <u>Id.</u> Nor may counsel argue facts outside the record. <u>State v. Storey</u>, 901 S.W.2d 886, 900 (Mo. banc 1995). A prosecutor's statement of personal opinion or belief not drawn from the evidence is improper. <u>Id.</u> at 901.

The trial court has broad discretion in controlling the scope of closing arguments. <u>Forrest</u>, 183 S.W.3d at 226. However, courts should exclude statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury. <u>State v. Lewis</u>, 466 S.W.3d 629, 633 (Mo. App. E.D. 2015). Counsel may rebut an issue raised by the opposing party even if the comment would otherwise be improper. <u>Id.</u>

Appellant failed to preserve his claim of error regarding the prosecutor's closing arguments by failing to object to the alleged error at trial; therefore, this claim is reviewed for plain error only. Under plain error review, this Court will reverse the trial court only when the court committed an evident, obvious, and clear error that affected a substantial right, resulting in a manifest injustice or a miscarriage of justice. Rule 30.20[1]; <u>State v. Washington</u>, 260 S.W.3d 875, 879 (Mo. App. E.D. 2008).

Here, the prosecutor's statements during Payne's testimony and closing argument that Payne did not receive anything in exchange for his testimony against Appellant was supported by the evidence at trial. Payne testified he requested a sentence of 90 days'

---

[1] All rule references are to Mo. R. Crim. P. 2014.

11

shock time for his outstanding case for first-degree murder and he did not receive such. Payne stated he pled guilty to second-degree murder and received a sentence of 15 years' imprisonment, and this sentence was not influenced by the information he provided on Appellant. Payne testified he completed his sentence for second-degree murder approximately 20 years before Appellant's 2014 trial. Therefore, the prosecutor's statements during Payne's testimony that Payne's murder charge and sentence were not reduced due to Payne's cooperation was proper as it was an accurate statement of the evidence.

The prosecutor's statement during closing argument that Payne testified he did not receive anything in exchange for his testimony was also an accurate representation of Payne's testimony. The prosecutor's argument Payne was "not making anything up" was a reasonable inference supported by Payne's trial testimony that Appellant was Payne's only source of information regarding Victim's murder. Furthermore, the prosecutor's closing statements were in direct response to the defense's closing statements suggesting Payne received a deal in exchange for his cooperation against Appellant and Payne's testimony lacked specific details about the crime which were not already available through other sources.

The trial court did not err in overruling Appellant's objection to the prosecutor's statement Payne did not receive a reduced sentence in exchange for his cooperation against Appellant or in failing to *sua sponte* strike portions of the prosecutor's closing argument.

<u>Leading Questions</u>

After the trial court overruled the defense's objection to the prosecutor's redirect examination of Payne as to whether Payne received a reduced sentence in his own criminal case for his cooperation, the court directed the prosecutor not to ask Payne leading questions on the issue. Upon commencing with redirect examination, however, the prosecutor did question Payne in a leading manner on this topic.

On appeal, Appellant argues the trial court erred in allowing the prosecutor to use leading questions during redirect examination to elicit this testimony. Because Appellant failed to preserve this issue, we review the claim for plain error only.

Leading questions are generally impermissible because they suggest the desired answer to the witness. <u>State v. McFadden</u>, 391 S.W.3d 408, 431 (Mo. banc 2013). "However, leading questions are permissible for preliminary matters, when the witness is shy, hostile or has difficulty with English, and when the witness already has answered the question and the attorney simply is repeating the answer." <u>Id.</u> In this case, Payne had already testified he did not receive a reduced sentence for his cooperation in Appellant's case, and the prosecutor's leading questions on the same topic amounted to simply repeating Payne's testimony already adduced. The trial court did not err in failing to *sua sponte* prevent the prosecutor from using leading questions during redirect examination of Payne.

Based on the foregoing, Appellant's Points II, III, and IV are denied.

<u>Point V – Testimony of Thomas Lortz</u>

Lortz and Appellant had been good friends for approximately 35 years. Lortz stated he and Appellant discussed their divorces, and Appellant stated he was not going

to pay child support and was unhappy Victim threatened to deny him visitation with their daughter. Lortz testified he and Appellant were at the Eagles Lodge and Appellant was complaining about Victim, child support, and visitation approximately seven to ten days before Victim was killed. Lortz testified Appellant offered to kill Lortz's ex-wife if Lortz would kill Victim. When Lortz told Appellant he was not interested in having his ex-wife killed, Appellant offered Lortz $3,000 to kill Victim. Lortz told Appellant he was not interested.

Lortz also testified, over the defense's objection, he and Appellant were at the Eagles Lodge with a group of people one to two years after Victim's murder. At one point in the conversation, Appellant looked at Lortz, grinned, and said, "Some people can get away with murder." Lortz stated he did not know the context of the statement or to what the statement pertained.

On appeal, Appellant argues the trial court abused its discretion in overruling his objection to Lortz's testimony as to Appellant's statement that "Some people can get away with murder" because the statement was irrelevant and prejudicial. Appellant contends that without evidence of the context in which the statement was made, the statement was irrelevant because it was possible Appellant's statement was made in reference to the murder of someone other than Victim.

To be admissible, evidence must be logically and legally relevant. State v. Anderson, 306 S.W.3d 529, 538 (Mo. banc 2010). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Id. Evidence is legally relevant when its probative value outweighs any prejudice. Id.

"Determination of the relevancy and admissibility of evidence is a matter clearly within the discretion of the trial court and will not be reversed in the absence of an abuse of that discretion." State v. Kidd, 990 S.W.2d 175, 178 (Mo. App. W.D. 1999). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Forrest, 183 S.W.3d at 223. We will reverse only when the error was so prejudicial it deprived the defendant of a fair trial, meaning there is a reasonable probability the result of the trial would have been different had the evidence not been admitted. Id. at 223-24.

The evidence indicated Appellant complained to Lortz about Victim and solicited Lortz to murder Victim about a week before Victim was killed. It is reasonable to infer Appellant's statement "Some people can get away with murder" less than two years after Victim was murdered, made while looking and smiling directly at a man Appellant had solicited to murder Victim, was made in reference to Victim. There is no evidence to suggest Appellant was referencing any other murder. Jurors are permitted to make reasonable inferences from the evidence. State v. Putney, 470 S.W.3d 210, 215-16 (Mo. App. E.D. 2015). In this context, the testimony was logically relevant as it tends to make Appellant's murder of Victim more probable.

The evidence is also legally relevant because, once placed in context, the probative value of the statement was significant as an admission. While the statement was damaging to Appellant as it tended to implicate him in the murder, the statement's probative value outweighs any prejudice. Appellant's Point V is denied.

15

## Point VI – Admission of Guns

Prior to Victim's murder, Appellant was known to conceal and carry a small .22 caliber semi-automatic pistol on his person, either in his boot or in a holster. Victim was shot and killed with a .22 caliber firearm. The bullet removed from Victim's body was a .22 caliber hollow point, copper jacketed round consistent with CCI .22 caliber ammunition.

Hours after Victim's murder, Appellant produced three guns to investigators for examination. From his van, Appellant retrieved a Winchester .22 caliber rifle, which was loaded with one round of CCI .22 caliber hollow point, copper jacketed ammunition. Investigators recovered a loose round of CCI .22 caliber hollow point, copper jacketed ammunition from the floorboard of the van. From his trailer, Appellant produced a Mossberg .22 caliber rifle and a Ruger .22 caliber revolver loaded with six rounds of CCI .22 caliber hollow point, copper jacketed ammunition. Forensic evidence excluded the guns Appellant produced to the authorities as being the murder weapon. The three .22 caliber guns seized from Appellant were admitted into evidence at trial.

On appeal, Appellant argues the trial court erred in allowing the State to admit the guns into evidence. Appellant contends the evidence was irrelevant and its admission resulted in manifest injustice, in that none of the guns were the murder weapon and the evidence suggested to the jurors Appellant was violent and caused the jurors to fear and loathe him. Appellant did not object to the admission of the guns or the testimony concerning the weapons at trial so his claim is reviewed for plain error only.

Again, to be admissible, evidence must be logically and legally relevant. Anderson, 306 S.W.3d at 538. Here, evidence Appellant possessed several other guns,

16

two loaded with ammunition indistinguishable from the ammunition used to kill Victim, one stored and loaded in the van Appellant was driving the night of Victim's murder, tended to prove Appellant shot Victim. There is no indication in the record the evidence was used to suggest Appellant was violent or caused the jurors to fear or loathe him. Because the evidence was relevant and was more probative then prejudicial, the trial court did not err in allowing the State to present evidence Appellant possessed additional .22 caliber guns. Appellant's Point VI is denied.

### Point VII – Evidence of Charged Criminal Conduct

Before trial, the State filed a motion in limine seeking admission of certified court records establishing Appellant and his wife were charged with assaulting Victim and her friend on June 24, 1990. The State alleged the evidence was admissible to show Appellant's motive for murdering Victim was, in part, to punish Victim for reporting the assault, to prevent Victim from testifying, and to avoid the prosecution of Appellant and his wife for the assault.

After a hearing, the trial court issued an order granting the State's motion. When the State sought to introduce the records at trial, defense counsel objected to their admission on the basis Appellant did not have notice of the assault charges and, therefore, the records lacked foundation and were irrelevant. The trial court reversed its earlier ruling and required the State to lay additional foundation demonstrating Appellant received notice of the charges. Appellant subsequently withdrew his objection after learning his former attorneys on the assault case were expected to testify they would not have entered their appearances and filed pleadings on Appellant's behalf without having first discussed the charges with Appellant.

17

On appeal, Appellant maintains the trial court erred in admitting evidence of the charges because the evidence was irrelevant and prejudicial.  Here, Appellant's act of withdrawing his objection to the admission of the exhibits into evidence amounts to an affirmative waiver of appellate review of the issue.  See State v. Williams, 118 S.W.3d 308, 313 (Mo. App. S.D. 2003) ("As distinguished from a simple failure to object, an announcement by the defense of 'no objection' amounts to an affirmative waiver of appellate review of the issue.").  Although Appellant waived this alleged error for appellate review, this Court can still review unpreserved claims for plain error.  Rule 30.20; State v. Wurtzberger, 40 S.W.3d 893, 897-98 (Mo. banc 2001).

Evidence of prior uncharged crimes, wrongs, or acts of a defendant "is admissible for certain purposes, such as to show motive, intent, lack of accident or mistake, or common scheme or plan."  State v. Edwards, 116 S.W.3d 511, 533 (Mo. banc 2003).  In this case, the evidence was admissible as it was relevant to prove Appellant's possible motive to murder Victim.  Appellant's Point VII is denied.

Conclusion

The judgment of the trial court is affirmed.

_Sherri B. Sullivan_

SHERRI B. SULLIVAN, P.J.

Kurt S. Odenwald, J., and
Lisa P. Page, J., concur.